**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALTER TOWNSEND,<br><br>      Petitioner,<br><br>  v.<br><br>BRUCE DAVIS, et al.,<br><br>      Respondents. | Civil Action No. 19-15157 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

  This matter comes before the Court on Petitioner Walter Townsend's Petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents filed a response to the Petition (ECF No. 7), to which Petitioner replied. (ECF No. 20.) For the following reasons, this Court will deny the Petition, and will deny Petitioner a certificate of appealability.

**I. BACKGROUND**

  In its opinion affirming Petitioner's conviction on direct appeal, the New Jersey Supreme Court summarized the factual background of Petitioner's convictions as follows:

> The State presented evidence at trial to show that on December 11, 1981, [Petitioner] lived with his girlfriend, Norma Williams, and her two sons, seven-year-old Jason and three-year-old Brian. That evening, [Petitioner] entered the home and told the two boys to go upstairs. The boys did so but stopped on the staircase and watched as [Petitioner] repeatedly struck their mother with a two-by-four with exposed nails until she was motionless. [Petitioner] then picked her up and called the boys to accompany him to the hospital.

While leaving the driveway, [Petitioner] crashed his blue pickup truck through the gate to the garage. On the way to the hospital, [Petitioner] instructed Jason to tell the police that a red tow truck struck his mother, after which three men jumped out of the truck and beat her with sticks. [Petitioner] threatened to kill Jason if he did not tell that story.

At the hospital, Williams was examined in the emergency room by Dr. Abrid. Williams was drowsy but conscious, her blood pressure was low, and she had alcohol on her breath. She had a cut over her eye, multiple bone swelling, and internal injuries. Dr. Abrid found no damage to the brain stem, and Williams's eye movements were normal. Dr. Abrid ordered oxygen and a blood transfusion for Williams.

The police were called to investigate. Patrolman Joseph Salvatore and his partner arrived at the hospital around 6:45 p.m. and tried to speak to Williams. After telling Salvatore she was struck by a car, Williams lost consciousness. Salvatore then located [Petitioner] and the boys in the waiting room and questioned them. [Petitioner] told Salvatore that when he arrived home and found Williams bleeding and leaning against the gate to their home, he immediately drove her to the hospital. Jason told Salvatore that a red truck hit his mother and three men got out of the truck and beat her with sticks before leaving. Salvatore did not question Brian because of his youth.

Detective Theodore Pogorzelski arrived at the hospital around 9:30 p.m. After the doctor informed him that Williams was in critical condition and unable to talk, Detective Pogorzelski met with [Petitioner] and the boys. Jason repeated his story about the red truck, but when asked about the three men, he said he did not see them beat his mother.

At some point, Detective Pogorzelski was informed that he could try to speak to Williams. He told Williams the reason he was there and that her prognosis did not look good. Williams's only response was to moan. When the detective asked if [Petitioner] had hit her, Williams shook her head from side-to-side indicating "no." Then he asked her if a truck had hit her, and she replied by shaking her head "no." When the detective asked if a car struck her, she moved her head up and down indicating "yes." Williams did not respond when asked the color of the car. She died at 12:10 a.m., shortly after the questioning.

Meanwhile, Detectives Taylor and Pascillo were looking for evidence of a hit-and-run accident in front of Williams's home.

2

They discovered that one of the chain-link gates to the driveway was damaged and had blue paint on it but found no debris, broken glass, or blood in the area. The police went door-to-door looking for witnesses but were unsuccessful. Later, when Officer Thomas Hoffman examined [Petitioner]'s blue truck parked near the hospital, he observed recent damage to the left rear.

A few hours after Williams died, [Petitioner] and the boys were taken to the police station. Officer Hoffman claimed he overheard [Petitioner] tell Jason not to say anything to the police. At the station, [Petitioner] was separated from the boys. Initially, Jason was reluctant to talk to the police. When he decided to talk, he accused [Petitioner] of fighting with his mother and striking her with a board. Jason stated that [Petitioner] told him to tell the story about the red truck and the three men. He also said that [Petitioner]'s truck hit the driveway gate on the way to the hospital.

Prior to interviewing [Petitioner], Detectives Pogorzelski and Taylor informed him of his *Miranda*[] rights. After waiving his rights, [Petitioner] denied instructing Jason to tell the police that a red tow truck struck Williams and stated that he never threatened Jason. He claimed he was at the corner bar when Jason ran inside and exclaimed that a red car had smashed the gate to their driveway. [Petitioner] said he immediately went home and discovered Williams on the driveway, moaning that a red car smashed through the gate.

That same day, Detective Pogorzelski re-interviewed Jason in the presence of his two uncles. Jason again accused [Petitioner] of killing his mother. Because Brian was only three years old, the police did not question him.

[Petitioner] consented to a search of the house he shared with the decedent. The police found blood on the couch but no weapons. [Petitioner] explained that he had placed Williams on the couch before taking her to the hospital. Pursuant to a search warrant, the police searched [Petitioner]'s truck. They were unable to find any evidence to support the theory that [Petitioner] had struck Williams with his truck.

The police canvassed the neighborhood again but located no witnesses. One neighbor, thirteen-year-old Annissa Gaines, was prevented from speaking to the police by her mother. The police completed the investigation without filing any charges against [Petitioner]. The State recognized the weaknesses in its case: seven-year-old Jason was the only witness who had implicated [Petitioner] and Jason had relayed several different stories. Additionally,

Williams had indicated to Detective Pogorzelski that [Petitioner] had not hit her, and that a car had struck her.

Thereafter, Jason and Brian lived with relatives and not [Petitioner]. When Brian turned eighteen, he moved to Trenton. [Petitioner] was also living in Trenton, and Brian visited him several times. In May 2001, Brian read a newspaper article about unsolved homicides that mentioned his mother. Brian contacted Jason and discussed the article. Later, Jason called the Mercer County Prosecutor's Office and requested that the case be reopened.

On August 2, 2001, the prosecutor reopened the investigation. Detective Albert DiNatale interviewed and obtained statements from several people who had lived near Williams in 1981. One neighbor, Beulah Ball, whose home shared a common wall with Williams's house, recalled that on the evening of December 11, 1981, she heard a female voice say, "Please, don't hit me anymore, please. Take me to the hospital."

Another witness, Annissa Gaines, the thirteen-year-old whose mother prevented her from speaking to police in 1981, said she saw [Petitioner] tap the driveway gate with his truck, back up, and then ram the gate. She remembered seeing a child in the window of the house but did not see anyone near the gate or lying on the ground. The next day she learned of Williams's death.

Patricia Brevard, a childhood friend of Williams, stated that [Petitioner] did not seem upset when he told her about Williams's death. Later, when [Petitioner] visited her, he admitted he had injured Williams before taking her to the hospital. Brevard claimed that she was afraid that if she reported the information to the police, [Petitioner] would harm her.

On August 10, 2001, Brian gave a formal statement outlining his version of the incident. He stated that while his mother was on the couch, he observed [Petitioner] repeatedly strike her with a board containing exposed nails.

A third son of Williams's, Freddie Williams, also testified at trial. He was fifteen years old when his mother died. He had lived with his mother and [Petitioner] for about five years, but in 1978 or 1979 he moved in with his grandparents because he could not tolerate [Petitioner]'s physical abuse of his mother.

Mercer County Medical Examiner Dr. Raafat Ahmad had performed an autopsy on Williams's body in December 1981. At that time, she listed the manner of death as "undetermined." When

4

> Dr. Ahmad reviewed the autopsy results again in May 2002, she concluded that Williams's injuries were more consistent with having been beaten to death.
>
> The State also presented the testimony of Dr. Judith Kabus, a licensed professional counselor. Dr. Kabus was a clinical supervisor who worked with abused women, incest victims, and rape victims at the Women's Center of Monmouth County from 1984 to 1998. She had counseled "hundreds" of battered women. The trial court found Dr. Kabus qualified to testify as an expert on battered women in general and battered women's syndrome.
>
> Dr. Kabus testified that to be diagnosed with battered women's syndrome, a woman had to exhibit five of eight characteristics. She discussed the common behavioral characteristics that battered women and women with the syndrome exhibit. She claimed that although there is a slight difference between them, both groups often lie about abuse or the origin of their injuries to protect the batterer, as well as to protect themselves from more abuse.
>
> [Petitioner] presented the expert testimony of Dr. Ronald J. Coughlin, who was qualified as an expert in psychological trauma. Dr. Coughlin agreed that there are common behaviors between women with battered women's syndrome and battered women who do not have the syndrome. Although he testified that in his experience lying to protect their batterers is a common behavioral characteristic of both groups of women, he was not aware of any research to support that finding.
>
> [Petitioner] did not testify. The jury found [Petitioner] guilty of murder.

*State v. Townsend*, 186 N.J. 473, 480-84 (2006).

On direct appeal, Petitioner argued that the admission of the battered women's syndrome testimony constituted error, and that the failure to give a limiting instruction as to that testimony was also erroneous. *Id.* at 479. The Appellate Division agreed and reversed Petitioner's conviction. The New Jersey Supreme Court, however, disagreed, affirmed Petitioner's conviction, and remanded the case for resentencing. *Id.* at 479-80. In addressing the battered women's syndrome related testimony, the New Jersey Supreme Court found that the subject was properly

5

the subject of expert testimony, that such testimony was proper in a criminal proceeding even in the absence of a formal diagnosis of the victim where relevant to the question of why a victim would lie to protect her abuser, and that the admission of Dr. Kabus's testimony in this matter was therefore entirely proper. *Id.* at 490-98. The state supreme court likewise found that the failure to provide a limiting instruction as to the proper use of that testimony was harmless in light of the limited testimony of Dr. Kabus – which did not attempt to diagnose the victim but instead was limited to the psychological effects of frequent abuse including the inclination of victims to lie about the source of their injuries – and the considerable testimony confirming that Williams had suffered frequent beatings at the hands of Petitioner. *Id.* at 499-500.

Following his direct appeal, Petitioner pursued a petition for post-conviction relief ("PCR") in which he raised a number of claims. Only one of those claims is relevant to this petition – a claim in which Petitioner asserted that his initial PCR counsel proved ineffective in failing to file a motion for a new trial based on alleged newly discovered evidence in the form of a letter written to Petitioner by Brian Williams in 2003. (*See* ECF No. 10-1 at 4.) This "alleged recantation letter . . . . [i]n pertinent part . . . states: 'I did not see you kill my mother, I told Jason. He said he already knew.'" (*Id.* at 3.). Although Brian Williams did admit to writing the letter to Petitioner, he "denie[d] he made this statement, asserting [that Petitioner] altered the letter by inserting those two sentences." (*Id.*). The PCR trial level and appellate courts both rejected this claim. (*Id.* at 6-7.) As the Appellate Division explained,

> The PCR court accepted the supposed recantation letter as "newly discovered," in light of a showing from [Petitioner] that he reached out to several attorneys, as early as 2003, to look at the letter. However, the court found the recantation letter failed [as a basis for a new trial based on newly discovered evidence] because significant and credible other evidence demonstrated [Petitioner]'s guilt. The PCR judge noted the following, overwhelming evidence of [Petitioner]'s guilt:

6

Jason was the primary eyewitness and testified to Brian witnessing the beating as well; a neighbor testified to hearing the victim scream for her life inside the house and another neighbor saw [Petitioner] ram his truck into his fence, suggesting an attempt to stage the scene; one of the victim's childhood friends testified [Petitioner] himself confessed his guilt to her a month and a half after [the] victim's death; after the victim had died, an officer overheard [Petitioner] telling Jason not to say anything to the police; and finally, [Petitioner] has given at least three different accounts of how Norma Williams died. First, when interviewed by police immediately after Norma's death in 1981, [Petitioner] told police a red truck hit her. Second, as mentioned above, [Petitioner] told a childhood friend of Norma's that he was responsible. Third, in 1996 [Petitioner] told Norma's son Freddie that Brian, who was three at the time of Norma's death, ran over her with a truck. Furthermore, [Petitioner]'s first story that a red truck hit Norma was neither supported by the state of the crime scene nor Norma's injuries. In light of this myriad other evidence, the [c]ourt cannot find that the newly-discovered evidence would likely change the jury's verdict if a new trial were granted.

Additionally, the PCR judge found the letter could not be viewed as reliable recantation evidence because the declarant, Brian Williams, adamantly denied making the recantation and consistently reaffirmed his trial testimony that he witnessed [Petitioner] kill his mother throughout [a] lengthy deposition. During his deposition in 2006, Brian testified in response to a question regarding the alleged recantation letter: "[t]his is a letter which was altered. This was the letter the prosecutors presented to me when [Petitioner] slipped in a sentence and changed my handwriting. This is not the original letter." As the PCR judge noted: "everything in [Brian's] deposition indicates he truly holds [Petitioner] responsible for the death of his mother, and nothing suggests he was motived by financial gain."

Finally, the PCR judge explained:

[W]here there are two different versions of the same letter, it stands to reason at least one of them must have been altered. This [c]ourt notes it is significantly easier to add to a handwritten document than it is to take something out without leaving clear

7

>  signs of tampering. There does not appear to be any such indications of tampering on the letter Brian claims to have written, which lacks the exculpatory line . . . . [T]he newly discovered evidence [thus] lacks credibility and would be unlikely to change the outcome of the trial.
>
>  The record amply supports the PCR judge's conclusion that the purported recantation is not the sort of evidence which would probably alter the outcome of a new trial, because it is inherently suspect, the declarant denies he recanted his trial testimony, and there is overwhelming evidence of [Petitioner]'s guilt which is unaddressed by the letter.
>
>  . . . .
>
>  [Petitioner] did not demonstrate ineffective assistance of PCR counsel or establish a prima facie case for PCR based on the purported newly discovered recantation evidence. Accordingly, he was not entitled to an evidentiary hearing . . . and his petition was properly denied by the PCR court.

(*Id.*)

## II.   **LEGAL STANDARD**

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

8

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III.    DISCUSSION

#### A.    Petitioner's Battered Women's Syndrome Claims

In his first two claims, Petitioner argues that the state courts erred in permitting the state to present expert testimony as to battered women's syndrome and its relevance to the victim's choice not to identify Petitioner as the source of her injuries when questioned shortly before her death, and in failing to provide a limiting instruction as to that evidence as part of jury instructions. Because "[t]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983), claims challenging the admissibility of testimony or other evidence are normally considered questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the

9

evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009).  A habeas petitioner may therefore raise a habeas claim based on a state law evidentiary decision only where he can show that the admission of the evidence in question denied him Due Process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair; it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a Due Process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

In this matter, the highest state court – the New Jersey Supreme Court – carefully considered the admissibility of the battered women's syndrome evidence and ultimately determined that the expert testimony was admissible under state law as it was relevant to the issue of the credibility of the victim's indication to police that she was hit by a vehicle, was based on the expert witness's training and experience and a wealth of scientific information regarding the syndrome, and was reliable.  Based on these conclusions, the state supreme court found the expert testimony admissible as it provided context to the victim's final conversations with police and could aid the jury in determining whether the victim's story was credible in light of the testimony

10

of her children. Nothing Petitioner has submitted in any way indicates that this conclusion was unreasonable or involved an unreasonable evaluation of the facts of Petitioner's trial, and the New Jersey Supreme Court's decision was neither arbitrary nor unduly prejudicial. Although the expert testimony in question – which essentially established that there is a tendency of women who have been subjected to physical abuse to lie about the source of their injuries whether officially diagnosed with battered women's syndrome or not – certainly was not helpful to Petitioner, it did not have the capacity to render his trial fundamentally unfair, especially in light of the eyewitness testimony of the victim's sons, the lack of any evidence to support the contention that the victim was struck by a car, and the testimony of other witnesses which led support to the boys' accusations. As the admission of this evidence did not render Petitioner's trial fundamentally unfair, and Petitioner has not shown that the admission of such evidence is contrary to or an unreasonable application of any relevant Supreme Court caselaw,[1] he has failed to show an entitlement to habeas relief on this basis.

Petitioner next contends that the state supreme court erred in finding that the failure to give a limiting instruction as to the battered women's syndrome testimony was harmless. That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir. 2001) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). A petitioner can therefore only show an entitlement to habeas relief based upon allegedly inadequate jury instructions where the petitioner proves that "the ailing

---

[1] While there is not a significant body of federal caselaw directly on point, those few relevant cases which have been decided by the Courts of Appeals suggest that such testimony is properly admissible under federal law. *See, e.g., United States v. Lopez*, 913 F.3d 807, 823-26 (9th Cir. 2019); *Arcoren v. United States*, 929 F.2d 1235, 1239-41 (8th Cir.), *cert. denied*, 502 U.S. 913 (1991). In any event, there is no relevant Supreme Court ruling of which this Court is aware to which the decision of the New Jersey Supreme Court was contrary or which that court unreasonably applied.

11

instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That a challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief; a petitioner can only prevail on such a claim by showing that the instruction rendered his trial fundamentally unfair. *Id.*

In this matter, the New Jersey Supreme Court determined that a limiting instruction should have been given directing the jury to consider the battered women's syndrome evidence only as it related to the credibility of the victim's denial that Petitioner had been the cause of her injuries. That court found, however, that the failure to give such a curative instruction – which was not requested by Petitioner's counsel – was ultimately harmless because neither testifying expert suggested that the victim actually had battered women's syndrome, the prosecution argued only that the jury should consider this testimony in aiding it to understand why the victim told police she had been hit by a car rather than beaten by Petitioner, and because the record was otherwise replete with testimony establishing the history of domestic violence committed by Petitioner against the victim – which itself was subject to a limiting instruction that it should not be used for propensity purposes – and the direct eyewitness testimony of the victim's two sons as to Petitioner's severe beating of the victim just prior to taking her to the hospital. In a habeas proceeding, an error of even constitutional dimension will be considered harmless and serve as no basis for relief unless the alleged error had a substantial and injurious effect upon the outcome of the trial. *Fry v. Pliler*, 551 U.S. 112, 115-16 (2007). In light of this eyewitness testimony, as well as the testimony of the victim's neighbors and the medical examiner which support the boys' version of events, and in light of the limited purpose for which the prosecution argued the jury should consider the expert testimony, this Court finds that the New Jersey Supreme Court's finding was neither unreasonable nor involved a misapplication of relevant federal law. The lack of a

12

curative instruction – especially in light of the general curative instruction given that the jury should not consider the testimony regarding his history of abusing the victim for propensity purposes – was not so grave an error that it had the capability of producing a substantial and injurious result, and the alleged failing in any event was not so severe as to amount to a denial of Due Process. The alleged failure to give the curative instruction was therefore harmless, and serves as no basis for habeas relief.

    **B.**    **Petitioner's Ineffective Assistance Claim**

In his final claim, Petitioner contends that he received ineffective assistance of counsel in relation to his claim that he was entitled to a new trial based on newly discovered evidence during PCR proceedings. The standard applicable to claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
>     In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the

13

> wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Initially, the Court notes that Petitioner raised his claim to the state courts in the form of a claim of ineffective assistance of post-conviction relief counsel. Indeed, even in his petition here, the attorneys he charges with failing to fully investigate and pursue his claim of newly discovered evidence are two attorneys who represented him during PCR proceedings only. (*See* ECF No. 1 at 14, 17-18; ECF No. 20 at 55-56.) Petitioner's claim is thus best characterized as a claim of ineffective assistance of counsel related to his collateral PCR proceedings, and not a claim of ineffective assistance of trial or appellate counsel. Pursuant to 28 U.S.C. § 2254(i), however, the "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." A petitioner therefore cannot obtain habeas relief through a claim of ineffective assistance of PCR

counsel such as the one Petitioner raises here. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

Even were this Court to accept, as did the PCR court, that Petitioner attempted to raise the letter to the attention of some other attorneys as early as 2003 and reconstrue his claim as one for ineffective assistance of trial or appellate counsel,[2] however, this claim would still fail for all of the reasons set forth by the state courts: the evidence against Petitioner – including two eyewitnesses, a confession to a third party, the testimony of witnesses indicating they overheard the fatal beating or saw Petitioner attempt to stage the scene, and wounds more consistent with a beating than a vehicular accident – is considerable and strongly supports the jury's conclusion that he was, in fact, the victim's killer; the alleged recantation is inherently suspect as it was apparently absent from the copy of the letter that the author possessed and the author of the letter vehemently denied ever having written the alleged recantation and instead claimed Petitioner added that line to the letter; and the alleged recanting eyewitness continually reaffirmed his trial testimony and asserted that he saw Petitioner kill his mother even after the alleged recantation was written. The letter, had it been presented under these circumstances, would not have had the capacity to change the outcome of Petitioner's trial, and Petitioner was therefore not prejudiced as a result of counsel's alleged failure to raise the issue. To the extent Petitioner contends that a handwriting expert should have been obtained to determine authorship, he has presented no expert testimony or reports which suggest an expert would have concluded that the lines in question were written by the alleged recanting witness rather than Petitioner himself, and Petitioner therefore cannot show any

---

[2] It is not clear from the record that Petitioner ever presented the letter or his new evidence claim to trial or appellate counsel following his conviction, and the record does not clearly identify to whom he showed the letter as early as 2003. This Court addresses the possibility that Petitioner may have shown the letter to trial or appellate counsel solely for the sake of completeness as the claim is in any event meritless and the claim, as raised in the current petition, is otherwise barred by § 2254(i).

prejudice stemming from a failure to obtain such an expert. Petitioner's ineffective assistance claim is thus barred as currently raised, and is in any event without merit even if it could be reconstrued as a claim for ineffective assistance of trial or appellate counsel. As all of Petitioner's claims are either barred or clearly without merit, Petitioner's habeas petition (ECF No. 1) is denied.

### IV.     CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all clearly either barred or without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

### V.     CONCLUSION

In conclusion, Petitioner's habeas petition (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

s/ Michael A. Shipp<br>
MICHAEL A. SHIPP<br>
UNITED STATES DISTRICT JUDGE